AUSA: REGINA R. McCULLOUGH          Telephone: (313) 226-9618

Special Agent    : PETER HAYES          Telephone: (313) 965-5506

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Eastern District of Michigan

**ORIGINAL**

**SEALED MATTER**

United States of America,

Plaintiff,

v.

ARIA OMAR SABIT

Case: 2:14-mj-30601
Judge: Unassigned,
Filed: 11-21-2014 AT 03:57 PM
IN RE: SEALED MATTER (CMP)(CMC)

Defendant(s).

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief:

On or about the date(s) of  January 2011 through Present          , in the county of  WAYNE and OAKLAND
in the  Eastern                        District of  Michigan          , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §1347 | HEALTH CARE FRAUD |
| 18 U.S.C. § 1425(a) | UNLAWFUL PROCUREMENT OF NATURALIZATION |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_Complainant's signature_

Peter Hayes, Special Agent, FBI
_Printed name and title_

Sworn to before me and signed in my presence.

Date:  **NOV 2 1 2014**

_Judge's signature_

**MAGISTRATE JUDGE
R. STEVEN WHALEN**
_Printed name and title_

City and state:  Detroit, Michigan

## AFFIDAVIT IN SUPPORT OF AN APPLICATION
## FOR A COMPLAINT AND ARREST WARRANT

I, Peter A. Hayes, Special Agent for the Federal Bureau of Investigation, being duly sworn, depose and state as follows:

## INTRODUCTION

1. I am a Special Agent with the Federal Bureau of Investigation (FBI), duly appointed according to law and acting as such.  As a Special Agent, I have received general law enforcement training at the FBI Academy, as well as specialized training in subjects including, but not limited to, health care fraud, prescription drug diversion, and money laundering.  I have been personally involved in investigations concerning prescription drug diversion, health care fraud and auto insurance fraud, as well as methods used to finance and conceal the profits of such operations.  I have investigated and interviewed numerous self proclaimed drug users, prescription drug dealers, patient recruiters, pharmacists, doctors, and owners and employees of medical clinics.  I have consulted with agents and officers of numerous federal, state, and local agencies, as well as the special investigation units of numerous auto insurance companies, in gaining an understanding of current trends in the diversion of prescription drugs and health care fraud, to include auto insurance fraud.  I am familiar with the Medicare program, the Michigan no-fault auto insurance program, as well as the federal health care fraud and narcotics trafficking laws.  I am currently assigned to the Detroit division of the FBI and my duties include investigating health care fraud, auto insurance fraud, and prescription drug diversion.  I am assigned to an investigation

pertaining to health care fraud committed by Doctor ARIA OMAR SABIT. The information herein is known to me through personal knowledge and investigation and/or from review of documents and interviews of people having direct knowledge of these events.

2. Your affiant has worked closely, on this investigation and other investigations, with Stephen Webber, who is a Special Agent of the United States (U.S.) Department of Homeland Security (DHS) Immigration and Customs Enforcement (ICE) Homeland Security Investigations (HSI). Special Agent Webber's official duties include conducting investigations involving violations of titles 8, 18, and 19 of the U.S. Code (USC), as well as any other offense committed against the U.S., including naturalization fraud.

3. This Affidavit is respectfully submitted in support of a complaint and arrest warrant for ARIA OMAR SABIT, MD, date of birth, January 1, 1974, who resides at 3645 Lahser Road, Bloomfield Hills, Michigan. This request is based on probable cause that SABIT committed Health Care Fraud, in violation of Title 18 United States Code § 1347, by performing medically unnecessary services, and billing for services not rendered. Additionally, SABIT's criminal activity is considered an aggravated felony under section 101(a)(43)(M)(i)[1] of the Immigration and Naturalization Act (INA), and as such, SABIT unlawfully obtained his citizenship in violation of Title 18 United States Code § 1425(a).

4. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

---

[1] An offense that involves fraud or deceit in which the loss to the victim or victims exceeds $10,000.

## SUMMARY OF INVESTIGATION

5. Your affiant, personally, and in conjunction with other law enforcement agencies, has been involved in the investigation of allegations that SABIT, was utilizing various businesses and medical practices, including, but not limited to, MICHIGAN BRAIN & SPINE PHYSICIANS GROUP, PLLC (MBSPG), of which SABIT is listed as the Registered Agent, and sole Member and Manager, to bill various federal health care benefit programs for services not provided, and/or to over-bill for services which were provided, in a scheme to defraud the federal health care benefit programs and other insurance companies.

6. In particular, your affiant has received information that SABIT has purportedly performed spinal surgeries, known as lumbar spinal fusions, on numerous patients, during which SABIT did not use the intended medical device(s), but rather placed no medical device(s) whatsoever in the patients' spinal column, while billing the patients' respective insurance coverage for services not performed, and leading these patients to believe he did in fact perform the intended surgery correctly.

## THE HEALTH CARE BENEFIT PROGRAMS

### THE MEDICARE PROGRAM

7. The Medicare Program (Medicare) is the federal healthcare program for the aged and disabled established by Congress in 1965, as Title XVIII of the Social Security Act and codified at 42 U.S.C. § 1395. Medicare is administered through the Centers for Medicare and Medicaid Services

(CMS). CMS is a division of the United States Department of Health and Human Services. Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."

8. Medicare is a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

9. Medicare includes coverage under four primary components, hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C) and prescription drug benefits (Part D).

10. Medicare Part A also covers physical therapy, occupational therapy, and skilled nursing services if a facility was certified by CMS as meeting certain requirements. Part B of the Medicare Program covers the cost of physicians, services and other ancillary services not covered by Part A.

11. Medicare Part D provides prescription drug coverage to persons who are eligible for Medicare. Under the program, eligible Medicare beneficiaries may enroll in a Medicare Prescription Drug Plan that adds prescription drug coverage to traditional Medicare. Alternatively, Medicare eligible beneficiaries may obtain prescription drug coverage by enrolling in a Medicare Advantage Plan under Part C of the Medicare program. Such Medicare Advantage Plans provide the full range of Medicare coverage to enrollees, including a prescription drug benefit under Medicare Part D.

12. Cahaba Safeguard Administrators, LLC (Cahaba) was the Program Safeguard Contractor for Medicare Part A and Part B in the state of Michigan as of July 2014. Prior to April 24, 2012, the Program Safeguard Contractor for Medicare Part A and Part B in the state of Michigan was Trust Solutions, LLC (Trust Solutions).

13. Health Integrity, LLC. (Health Integrity) was the National Benefit Integrity Medicare Drug Integrity Contractor (NBI MEDIC) for Medicare Part D in the state of Michigan as of the date of this affidavit.

14. The basic requirement for any claim to be payable by Medicare is that the service must be "reasonable and necessary for the diagnosis or treatment of illness or injury." What is "reasonable and necessary" for certain conditions is defined based upon accepted practices in the medical community, as further defined by National Coverage Determinations issued by CMS and Local Coverage Determinations issued by the Medicare administrative contractor for the State of Michigan.

15. In order to bill the Medicare Part A or Part B Programs (or private insurance programs), a medical provider must bill for one, or more, Current Procedural Terminology (CPT) Code(s).  CPT Codes, which are developed and maintained by the American Medical Association (AMA), are individualized numbers which are assigned to every task or service a medical provider might perform on a patient.  CPT codes are then used by Medicare, and private insurance companies (other than auto insurance companies), to determine the amount of reimbursement, or payment, a medical provider will receive for the task or service performed on a patient.  As CPT codes are meant to ensure uniformity by the AMA, all medical providers and insurance companies use the same set of CPT Codes, which are updated annually.

## BLUE CROSS BLUE SHIELD OF MICHIGAN

16. Blue Cross Blue Shield of Michigan (BCBSM) is a non-profit, private health insurance company based in Detroit, Michigan. BCBSM is the largest independent licensee of Blue Cross Blue Shield Association, which is a federation of thirty-nine separate health insurance organizations and companies in the United States

17. Physicians contract with BCBSM to provide health care services to BCBSM members. In return, BCBSM will pay the physician directly for services rendered to BCBSM members. By contract, the provider certifies that claims submitted are for covered services which the provider has personally rendered or personally supervised. BCBSM remits payment to the provider via check or electronic transfer.

18. BCBSM is a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

## THE MEDICAID PROGRAM

19. Pursuant to Title XIX of the Social Security Act (42 USC 1396, et seq.) and the Michigan Social Welfare Act (400.1, et seq.; MSA 16.614(11), as amended, the Michigan Department of Community Health (hereinafter referred to as DCH) administered the Michigan Medical Assistance Program (hereinafter referred to as Medicaid).

20. Medicaid is a Federal/State program which has as its purpose the provision of medical services to those persons who could not otherwise afford them.

21. Medicaid is a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

22. Providers who seek to bill are informed of the rules and responsibilities through provider manuals that are provided to them by DCH (for Medicaid) at the time of enrollment, and periodically receive correspondence when policy/procedural changes occur. Medicaid and Medicare participating providers and/or facilities apply to Medicaid and Medicare programs for the ability to bill Medicaid and Medicare. As part of the application process, they (the provider) must certify that they will comply with all Medicaid and Medicare statutes, regulations, and program guidance and they will not submit claims in reckless disregard of whether the claims are payable. Each provider is issued a National Provider Identification (NPI) number. Medical providers submit claims to Medicaid and Medicare using their assigned NPI. Each claim for reimbursement includes, at a minimum, the beneficiary's name, the beneficiary's claim number, the date of service, the diagnosis/nature of illness, and the procedure/services (annotated by a procedure code).

## MICHIGAN NO-FAULT AUTOMOBILE (AUTO) INSURANCE

23. The state of Michigan, in 1973, adopted the no-fault auto insurance system. Under no-fault auto insurance, an insurance provider is obligated to cover certain expenses of their insured customer, including, but not limited to, medical bills arising from an auto accident.

24. As of November 2014, there are approximately 12 states with a no-fault auto insurance program. However, the state of Michigan is unique in that it is the only state which covers unlimited medical and rehabilitation benefits to any individual covered by Michigan no-fault insurance who is

injured in an auto accident. Because of this unlimited coverage, individuals covered under Michigan no-fault insurance are generally restricted from filing a lawsuit related to their accident, except when someone is killed or very seriously injured. In turn, under a no-fault auto insurance system, disputes over which party was at fault in an auto accident, will not delay payments of medical bills.

25. One of the primary components of a no-fault auto insurance system is Personal Injury Protection (PIP). PIP pays for expenses including:

   a. all medical costs, including transportation costs, pertaining to the auto accident, with no limit for the life of the injured person;

   b. lost wages, up to 85% of the income the injured person would have earned if not injured (capped at $5,392.00 per month as of 10/01/2014), for up to three years; and

   c. up to $20 per day, for up to three years, for replacement services to cover routine household services, such as house cleaning, washing dishes, yard work, babysitting, child transportation, etc., which injured persons are no longer able to do for themselves, or their dependants, as a result of the auto accident.

26. Due to Michigan's unique unlimited lifetime medical benefits, the Michigan Catastrophic Claims Association (MCCA) was established in 1978. The MCCA is a private non-profit unincorporated association which reimburses Michigan no-fault auto insurance companies for each PIP claim which exceeds a certain dollar amount. That amount, which is revised periodically, as of October 2014, is $530,000.00. All auto insurance companies which provide no-fault policies in Michigan are accessed a fee to cover these catastrophic medical claims. This fee, which is generally passed on to the insured policyholder, as of October 2014, is

$186.00 per insured vehicle, regardless of the value of the vehicle.

27. As Michigan is known to have some of the highest auto insurance costs in the United States, due, in part, to the MCCA assessment, one option insured policyholders have to reduce the costs of their auto insurance policy is to coordinate their health insurance policy with their auto insurance policy. The Michigan no-fault system requires auto insurance companies to offer a discount to policy holders who choose to coordinate their no-fault auto insurance with their eligible health insurance plans. Under a coordinated policy, the injured person's primary health insurance pays for medical costs first, and the no-fault auto insurance policy pays for excess costs not covered under the primary health insurance policy. As the auto insurance company stands to pay less costs resulting from an accident on a coordinated policy, the no-fault auto insurance policy costs the insured policyholder less money.

28. Unlike Medicare and private health insurance companies, Michigan no-fault auto insurance companies are not subject to a pre-set CPT code billing schedule. Michigan no-fault auto insurance companies are required to pay expenses which are "reasonable" and "customary" in a timely fashion, which, subject to limited exceptions, is within 30 days of "an insurer receiv[ing] reasonable proof of the fact and the amount of loss sustained" or the insurer will fall responsible to an annual interest rate of 12% on the overdue payments ((*Mich. Comp. Laws § 500.3142*). However, as the terms "reasonable" and "customary" are not defined, and are therefore subjective terms, medical providers often bill Michigan no-fault auto insurance companies significantly more for the same CPT codes than what they would be reimbursed for by Medicare or other health care providers. This often leads the Michigan no-fault auto

insurance companies to refuse payments on charges which the insurance companies believe do not meet the "reasonable" and "customary" requirements. These withheld payments often lead the medical providers and/or medical clinic owners to file suit, through a plaintiff attorney, against the auto insurance companies.

29. Health care provided pursuant to an auto insurance claim for personal injury is a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

## CASE BACKGROUND

30. ARIA OMAR SABIT, is originally from Afghanistan and was first admitted to the United States as a refugee on March 31, 1984. SABIT received his medical degree from Virginia Commonwealth University School of Medicine in 2002 and was licensed to practice medicine in the State of California on June 17, 2009. He was subsequently licensed to practice medicine in the State of Michigan on March 21, 2011.

31. This case was predicated on information received by your affiant, and other law enforcement individuals, from numerous people claiming that SABIT was billing health insurance plans for services, in particular, lumbar spinal fusions, which were not provided and/or not medically necessary.

32. Through this investigation, your affiant has learned that between approximately June 2009 and December 2010, SABIT was a resident of California, where he performed surgeries, including, but not limited to spinal fusions. Your affiant is also aware that SABIT is the subject of

over two dozen medical malpractice suits in California from an 18-month timeframe he spent operating in California between 2009 and 2010.

33. Through this investigation, your affiant is aware that on or about April 5, 2011 SABIT filed, or caused to be filed, the Articles on Organization for MBSPG with the Michigan Department of Energy, Labor & Economic Growth. These Articles of Organization listed SABIT as the registered agent for the business, and listed 16100 19 Mile Road, Suite 200, Clinton Township, Michigan as the registered address.

34. SABIT subsequently filed, or caused to be filed, the 2012, 2013, and 2014 Annual Report & Statement for MBSPG, with the Michigan Department of Energy, Labor & Economic Growth, on or about the dates of January 20, 2012, November 26, 2012, and January 27, 2014, respectively. Each of these reports listed the registered address as 29355 Northwestern Highway, Suite 130, Southfield, Michigan, which is the current location of MBSPG.

35. Your affiant has also learned that subsequent to obtaining his license to practice medicine in the state of Michigan, SABIT obtained temporary privileges at locations including, but not limited to, Detroit Medical Center, Doctor's Hospital of Michigan and McLaren Lapeer Regional Medical Center.

36. Your affiant is aware that the Medical Board of California alleged that SABIT performed unnecessary spinal surgeries on multiple patients and made false claims within the patients' medical files. Your affiant has reviewed accusations brought by the Medical Board of California against SABIT for such matters, which include accusations of Gross Negligence, Repeated Negligent Acts, Dishonest and Corrupt Acts, and Failure to Maintain Accurate and Adequate Records.

37. Your affiant is aware that on July 29, 2014, SABIT signed a Stipulated Surrender of License and Order, which he entered into "freely, voluntarily, knowingly, and intelligently…" As a result of entering into this Stipulated Surrender of License and Order, SABIT agreed that he "shall lose all rights and privileges as a physician and surgeon in California" and "shall further lose all future right(s) to apply for medical licensure in California and to file a petition for reinstatement of his surrendered license and certificate in California." This Stipulated Surrender of License and Order was so ordered by the Medical Board of California on August 18, 2014, and became effective on August 25, 2014.

38. SABIT is also currently a subject of various federal investigations by the U.S. Department of Justice, U.S. Department of Health & Human Services – Office of Inspector General (HHS-OIG), and the United States (U.S.) Department of Homeland Security (DHS) Immigration and Customs Enforcement (ICE) Homeland Security Investigations (HSI), as well as the FBI.

## SPINAL SURGERIES

39. According to information available on the website for the Massachusetts General Hospital, there are five regions of the spine: the cervical, thoracic, lumbar, sacral and coccyx regions. The cervical spine consists of seven vertebrae in the neck region; the thoracic spine consists of twelve vertebrae in the chest region; and the lumbar spine of five vertebrae in the lower back region. The sacral region of the spine is below the lumbar region and consists of additional fused (or non-

articulating) vertebrae. The coccyx region (commonly referred to as the "tailbone") is below the sacrum region, and is also consists of additional fused (or non-articulating) vertebrae.

40. Each vertebra of the spine, with the exception of the coccyx, is referred to by a letter and number denoting its region and location. From top to bottom, the seven vertebrae of the cervical spine are named C1-C7; the twelve vertebrae of the thoracic spine are named T1-T12; and the five vertebrae of the lumbar spine are named L1-L5. In addition, the vertebra of the sacral spine that adjoins the lumbar spine is named S1.

41. According to information available on the website for the Mayo Clinic:

    a. a laminectomy (also referred to as "decompression surgery") is a "surgery that creates space by removing the lamina – the back part of the vertebra that covers [the] spinal cord."

    b. a diskectomy (also referred to as "discectomy") is a surgical procedure to remove the damaged portion of a herniated disk in [the] spine."

    c. a "spinal fusion is surgery to permanently connect two or more vertebrae in your spine, eliminating motion between them. Spinal fusion involves techniques designed to mimic the normal healing process of broken bones. During spinal fusion, your surgeon places bone or a bone-like material within the space between two spinal vertebrae. Metal plates, screws and rods may be used to hold the vertebrae together, so they can heal into one solid unit."

## PROBABLE CAUSE

### *Patient Interviews and Consultant Review*

42. Your affiant has interviewed four former patients of SABIT (Patient-1, Patient-2, Patient-3, and Patient-4), all of whom were told by SABIT that they needed to undergo a spinal surgery or "spinal fusion" whereby certain hardware would be placed in the patient's back. All of these patients had spinal surgery performed by SABIT, and all were of the understanding that SABIT had indeed performed the discussed spinal fusion. Subsequently, after continuing pain, all patients received second opinions from other doctors stating that no such spinal fusion had been performed and there was no evidence of any screw, or any medical device(s), in the spinal column of the patient.

43. Your affiant has also interviewed a fifth patient (Patient-5) who stated that SABIT made false claims about his/her medical condition. Patient-5 also underwent surgery performed by SABIT, and has since experienced continued pain and significant hardships, and has sought the opinion of another surgeon.

44. Your affiant is aware that the United States Attorney's Office for the Eastern District of Michigan has contracted with an Orthopaedic Surgeon (Consultant-1) in this case. Consultant -1 is a specialist in spinal surgery who is certified in orthopaedic surgery by the American Board of Orthopaedic Surgery, and is a clinical professor at a well-known research university and medical center.

45. Consultant-1 has had an opportunity to review patient records, including but not limited to the operative reports prepared by SABIT, for Patient-1, Patient-2, Patient-3 and Patient-4. At the time of Consultant-1's review, patient records were not available for Patient-5.

46. Your affiant has reviewed the findings of Consultant-1, which are briefly summarized following the respective summaries of the Patient interviews and billing data:

*Patient-1*

47. On June 11, 2014, your affiant interviewed Patient-1. During the interview, Patient-1 stated that in, or around, January or February 2012, s/he was referred to SABIT. Immediately upon meeting SABIT, SABIT held up an X-ray film of Patient-1 and told Patient-1 that s/he needed surgery.

48. Patient-1 underwent a surgery, performed by SABIT, in February 2012 and experienced problems, including infections, with the surgery. During Patient-1's pre-surgical encounters with SABIT, SABIT never performed a physical exam on Patient-1, nor did SABIT order any diagnostic testing for Patient-1.

49. Patient-1 continued to experience pain after the surgery. Patient-1 saw SABIT at his office regarding the continued pain on multiple occasions. SABIT had Patient-1 undergo several MRI scans, and continued to tell Patient-1 that Patient-1 was okay. Eventually, SABIT told Patient-1 that Patient-1 had nerve damage in Patient-1's neck, and needed an additional surgery on his/her neck to correct the problem. Patient-1 elected not to undergo the neck surgery.

50. Patient-1 sought the advice of his/her primary care physician (Doctor-1), who ordered and reviewed an x-ray and an MRI scan on Patient-1. Patient-1 learned through Doctor-1 that it was clear that no medical device(s) had been placed in or around Patient-1's spinal column.

51. SABIT produced an Operative Report for the surgery he purportedly performed on Patient-1. Your affiant has obtained and reviewed a copy of this report. Included within the "Procedure Performed" and "Details of Operation" sections of the report, SABIT indicated he, among other procedures, performed a laminectomy at the L4, L5 and S1 levels, and a fusion at the L4, L5 and S1 levels.

52. Patient-1 was insured under Medicaid. Your affiant has reviewed billings submitted by SABIT to Medicaid. SABIT billed Medicaid a total of $43,103.00 for the surgery he performed on Patient-1.

53. The above mentioned billings to Medicaid for surgery purportedly performed by SABIT on Patient-1 included, but was not limited to, the following:

    a. CPT Code 22612 – Lumbar Spine Fusion: Billed for $13,633

    b. CPT Code 22842 – Insert Spine Fixation Device: Billed for $8,982

    c. CPT Code 22614 – Spine Fusion Extra Segment: Billed for $3,461

    d. CPT Code 63017 – Removal of Spinal Lamina: Billed for $10,769

54. Within Consultant-1's review of records pertaining to Patient-1, Consultant-1 had findings including, but not limited to:

    a. "[T]he operation proposed [by SABIT] in the lumbar spine was not indicated since that there was no evidence of any neurocompression of any significance at all that would explain [Patient-1's] symptoms."

    b. "[T]here was no evidence of any hardware being placed" upon review of a post-operative MRI.

    c. "No evidence of any decompression by removing the ligamentum flavum or doing any laminectomy."

    d. "No work was done on the L5-S1 facet joint at all."

    e. "The operative report was false."

    f. "This diagnosis and operative treatment were below the standard of care as well."

### *Patient-2*

55. One June 11, 2014, your affiant interviewed Patient-2. Patient-2 stated that s/he was told by SABIT, during his/her first visit with SABIT, which was in, or around, April 2012, that s/he needed surgery.  SABIT told Patient-2 that he was going to put pins in Patient-2's back to lift up the lumbar section of Patient-2's back.  Patient-2 stated that SABIT didn't show any pictures or models of what was going on or what he was going to perform on Patient-2's back.  Approximately one week later, Patient-2 underwent a surgery performed by SABIT.

56. After the surgery, SABIT told Patient-2 that he did a lumbar fusion to raise Patient-2's lumbar and told Patient-2 that the devices that were put in Patient-2's back were like bone screws.

57. Patient-2 saw SABIT for multiple follow up visits at SABIT's office. After the third post-surgical office visit with SABIT, Patient-2 sought the opinion of a different doctor (Doctor-2).  Doctor-2 ordered an MRI scan for Patient-2.  Doctor-2 showed Patient-2 the results of the MRI, and explained that Patient-2 had a broken vertebra.  Additionally, Doctor-2 showed Patient-2 that there were no medical device(s) present that were supposedly put in place by SABIT.

58. Patient-2 eventually underwent a corrective surgery, which was performed by Doctor-2, and continues to see doctors for his/her pain.

59. SABIT produced an Operative Report for the surgery he purportedly performed on Patient-2. Your affiant has obtained and reviewed a copy of this report. Included within the "Procedure Performed" and "Operative Procedure" sections of the report, SABIT indicated he, among other procedures, performed a laminectomy at the L5, L4 and S1 levels, and a fusion at the L4, L5 and S1 levels.

60. Patient-2 was insured under Medicaid. SABIT billed Medicaid a total of $41,762.00 for the surgery he performed on Patient-2.

61. The above mentioned billings to Medicaid for surgery purportedly performed by SABIT on Patient-2 included the following:

   a. CPT Code 22612 – Lumbar Spine Fusion: Billed for $13,633

   b. CPT Code 22842 – Insert Spine Fixation Device: Billed for $8,050

   c. CPT Code 22614 – Spine Fusion Extra Segment: Billed for $6,922

   d. CPT Code 63047 – Removal of Spinal Lamina: Billed for $9,393

   e. CPT Code 63048 – Remove Spinal Lamina AddOn: Billed for $3,764

62. Within Consultant-1's review of records pertaining to Patient-2, Consultant-1 had findings including, but not limited to:

   a. "The CT scan done postoperatively before the second operation [performed by Doctor-2] showed no evidence of any hardware placement."

   b. "No evidence of laminectomy is present" despite indications by SABIT, in his operative report, that he performed a laminectomy.

   c. "[I]t appears that Dr. Sabit falsified an operative report indicating he was doing a fusion with instrumentation along with laminectomy, but none of these are in fact done as evidenced on the postoperative CT scan."

*Patient-3*

63. On August 13, 2014, your affiant interviewed Patient-3. Patient-3 stated
    that s/he first met SABIT in January 2012, when Patient-3 took someone
    else to see SABIT for a surgical consultation. During this surgical
    consultation, SABIT recommended surgery for the other individual.
    SABIT learned during this surgical consultation that Patient-3 was also
    experiencing back pain. SABIT described in general the type of surgical
    procedure he would recommend for Patient-3 and encouraged Patient-3
    to schedule a consultation with him. SABIT also referred Patient-3 to get
    an MRI.

64. Shortly after getting the MRI, Patient-3 visited SABIT. SABIT informed
    Patient-3 that spinal stenosis was evident, and he would need to perform
    surgery on Patient-3. SABIT informed Patient-3 that Patient-3 had issues
    at L1-L2 and L4-L5. SABIT recommended that he perform a
    decompression at L1-L2, and possibly a laminectomy. SABIT stated that
    he was not sure if he would have to do anything at L4-L5 but thought that
    he would have to do a laminectomy. SABIT explained that in a
    decompression he drilled a hole to allow the spinal cord to expand
    because it was pinched. SABIT also explained that depending upon the
    slippage, he may have to do a fusion at L4-L5.

65. Patient-3 elected to take SABIT's advice, and Patient-3 underwent
    surgery, performed by SABIT, in March 2012. SABIT told Patient-3 that
    he did an L4-L5 fusion using screws. At a subsequent appointment,
    Patient-3 asked about the screws and SABIT said that the screws were

made of titanium. In the recovery room, SABIT told Patient-3 that everything went well during the surgery. Patient-3 saw SABIT on numerous post-surgical follow-up visits, and SABIT told Patient-3 that s/he was fine.

66. Within one year following the surgery, Patient-3 began to experience significant pain in the area of the supposed surgery. Patient-3 eventually sought a second opinion from a doctor (Doctor-3) who was associated with a hospital which Patient-3 held in high regard. Doctor-3 performed one or more x-rays of Patient-3's spinal column. Doctor-3 informed Patient-3 that he saw no evidence of any hardware in Patient-3's spinal column. Patient-3 provided Doctor-3 with the operative reports documenting the surgeries purportedly performed by SABIT.

67. Doctor-3 performed a second surgery on Patient-3. Doctor-3 provided Patient-3 with documentation showing that he had found no evidence of any previous decompression or laminectomy being performed, and he found no evidence of any screws in Patient-3's back. After the surgery performed by Doctor-3, Doctor-3 took x-rays of Patient-3's back and showed Patient-3 the hardware which was evident in Patient-3's back. Patient-3 stated the surgery performed by Doctor-3 was successful.

68. SABIT produced an Operative Report for the surgery he purportedly performed on Patient-3. Your affiant has obtained and reviewed a copy of this report. Included within the "Procedure Performed" and "Details of Operation" sections of the report, SABIT indicated he, among other procedures, performed laminectomies at the L1, L2, L4, and L5 levels, and a fusion at the L4-L5 level.

69. Patient-3 was insured by BCBSM health insurance. Your affiant has reviewed billings submitted by SABIT to BCBSM. SABIT billed BCBSM a total of $42,680.00 for the surgery he performed on Patient-3.

70. The above mentioned billings to BCBSM for surgery purportedly performed by SABIT on Patient-3 included, but were not limited to, the following:

   a. CPT Code 22612 – Lumbar Spine Fusion: Billed for $13,633.00

   b. CPT Code 22840 – Insert Spine Fixation Device: Billed for $6,750.00

   c. CPT Code 63017 – Removal of Spinal Lamina: Billed for $9,393

   d. CPT Code 63048 – Remove Spinal Lamina AddOn: Billed for $5,646

71. Within Consultant-1's review of records pertaining to Patient-3, Consultant-1 had findings including, but not limited to:

   a. "It appears by report of [Doctor-3] as well as the report only of the MRI scan and x-rays that there was no placement of any instrumentation in the spine that was indicated as having been done by Dr. Sabit."

   b. "Additionally, there was no laminectomy of L4-5 that was done. Additionally noted was that [SABIT] did not address the severe spinal stenosis at L3-4."

   c. "This was below the standard of care and was in addition to falsification of the operative report and procedures done."

*Patient-4*

72. On August 13, 2014, your affiant interviewed Patient-4. Patient-4 first saw SABIT as a patient in, or around, February 2012, after Patient-4 went to a hospital experiencing pain. SABIT admitted Patient-4 to the hospital and told Patient-4 that based off his review of an older MRI Patient-4 previously had undergone, that Patient-4 had two herniated disks, and problems with the L4-L5 area, and needed surgery. SABIT ordered an MRI to be performed the following morning to confirm this decision. Patient-4 received the MRI the following morning. After the MRI, SABIT informed Patient-4 that s/he had numerous problems and had no non-surgical options and that her only option was to undergo a spinal fusion. SABIT never gave Patient-4 the option to discuss this surgery with Patient-4's primary care physician, or any other doctor, prior to the surgery.

73. Patient-4 underwent surgery, performed by SABIT, in March 2012.

74. Immediately after the surgery performed by SABIT, Patient-4 began experiencing extreme pain for an extended period of time. Patient-4 ended up confined to a wheelchair due to the pain and his/her inability to walk or stand for long periods of time. During follow-up visits with SABIT, Patient-4 explained to SABIT that s/he was in pain, but SABIT was dismissive. SABIT did not perform exams or check Patient-4's incision during these follow-up appointments.

75. Approximately one year after Patient-4's surgery, Patient-4 underwent another MRI. SABIT reviewed this MRI and told Patient-4 that s/he was fine and that the results of the MRI did not show anything.

76. Patient-4 was later re-admitted to the same hospital in which SABIT performed a surgery on Patient-4.  During this hospital stay, Patient-4 saw another doctor (Doctor-4) who ordered another MRI for Patient-4.

After reviewing the results of the MRI, Doctor-4 told Patient-4 that there was no hardware present in Patient-4's back.  Patient-4 also saw Doctor-3 for another opinion. Doctor-3 confirmed with Patient-4 that Patient-4 did not have any hardware in his/her back.

77. SABIT produced an Operative Report for the surgery he purportedly performed on Patient-4.  Your affiant has obtained and reviewed a copy of this report. Included within the "Procedure" and "Operation" sections of the report, SABIT indicated he, among other procedures, performed a laminectomy at the L4, L5, and S1 levels, and a fusion at the L4, L5, and S-1 levels.

78. Patient-4 was covered under Medicaid. SABIT billed Medicaid a total of $58,293.00 for the surgery he performed on Patient-4.

79. The above mentioned billings to Medicaid for surgery purportedly performed by SABIT on Patient-4 included the following:

   a. CPT Code 63030 – Low back Disk Surgery: Billed for $18,740
   b. CPT Code 22612 – Lumbar Spine Fusion: Billed for $13,633
   c. CPT Code 22840 – Insert Spine Fixation Device: Billed for $6,750
   d. CPT Code 63035 – Spinal Disk Surgery Add-On: Billed for $12,248
   e. CPT Code 22614 – Spine Fusion Extra Segment: Billed for $6,922

80. Consultant -1's review of medical records pertaining to Patient-4 was limited to printed medical records, as "all of the imaging studies [performed on Patient-4] were on a proprietary viewing program" which Consultant-1 could not open.  However, within Consultant-1's review of records pertaining to Patient-4, Consultant-1 had findings including, but not limited to:

a.  "It appears that the patient underwent … an operation by [SABIT] that in his operative report indicated an L4-S1 laminectomy fusion with transfacet screws done at both levels."

b.  Patient-4 "continued to have symptoms and ultimately was seen by [Doctor-3], who took x-rays and an MRI scan had indicated in his report there was no hardware placed."

c.  "It appears from the review of the medical records that [SABIT] did not perform instrumentation and fusion of this patient as he falsely indicated in his operative report."

*Patient-5*

81. On September 26, 2014, your affiant interviewed Patient-5. Patient-5 stated s/he was referred to SABIT by a doctor (Doctor-5) that Patient-5 was seeing for pain management, as a result of an April 2011 auto accident in which Patient-5 was involved. When Patient-5 first saw SABIT, SABIT ordered MRI studies on Patient-5. On Patient-5's second visit with SABIT, SABIT said that he recommended surgery on Patient-5's neck, wherein he would remove a disc and insert a metal plate and gapper.

82. Patient-5 was adamant with SABIT that s/he did not want to undergo surgery, and instead wanted to try other options, including injections for pain management. After trying injections, Patient-5 saw SABIT again. SABIT told Patient-5 that surgery was the only option. SABIT described the neck surgery to Patient-5 as an outpatient procedure lasting approximately 45 minutes. Patient-5 had a case manager (CM-1) with

him/her at the time of this meeting. CM-1 asked SABIT why the surgery would take place in an outpatient facility, as opposed to a hospital. SABIT responded that a hospital would not take Patient-5's auto insurance. Patient-5 had the surgery in November 2011 in an outpatient facility, and was sent home after spending about 50 minutes in a recovery room.

83. Patient-5 followed up with SABIT approximately one week after the surgery. SABIT checked the incision and said that everything went well. SABIT took out his cell phone and asked Patient-5 if s/he wanted to see what he did, indicating that he had taken pictures of Patient-5's surgery on his cell phone. However, SABIT could not find the pictures on his cell phone.

84. Patient-5 saw SABIT for follow up appointments at his office on Northwestern Highway in Southfield, Michigan. Patient-5 described this office, and stated that his/her medical file was at this location.

85. After the neck surgery, Patient-5 was not satisfied. Patient-5's range of motion did not return, and s/he continued to experience numbness in his/her arms and hands. SABIT told Patient-5 multiple times that a second surgery would correct the problems Patient-5 was experiencing with his/her legs. SABIT said that he was going to shave off some of Patient-5's bone, from his/her spine, and make a cage around his/her vertebrae to protect the spine.

86. Patient-5 underwent a surgery in his/her lumbar region in February 2012 at the same outpatient facility as the first surgery, and was sent home following the surgery. Within a few days, Patient-5 realized that the incision area for the second surgery was infected. The infection lasted at least 10 days. Approximately two weeks after the second surgery,

Patient-5 ended up in a local hospital (Hospital-1). After Patient-5 underwent x-rays and an MRI at Hospital-1, a surgeon at the hospital told Patient-5 that there was no evidence of any metal in Patient-5's neck, and no evidence of any spinal cage, or bone shavings in Patient-5's lumbar region. There was also no evidence of any screws or other metal medical device(s). Patient-5 stated that the surgeon at Hospital-1 told Patient-5 that it appeared that SABIT attempted to do something but did not know how to do it. Patient-5 stated that a surgeon from Hospital-1 spoke with SABIT over the phone, and SABIT informed the Hospital-1 surgeon that Patient-5 was having issues due to a family history of Multiple Sclerosis (MS). Patient-5 stated neither s/he, nor anyone in his/her family has ever had MS.

87. Your affiant served a subpoena for medical records pertaining to Patient-5 on Hospital-1. Additionally, another Special Agent of the FBI served a subpoena for medical records pertaining to Patient-5 on the auto insurance company providing insurance to Patient-5 at the time of the April 2011 automobile accident. Your affiant has received records from the aforementioned hospital and auto insurance company, and has reviewed these records. Your affiant noted several documents, including, but not limited to, the following:

   a. A letter, written on MBSPG letterhead, to the doctor that referred Pateint-5 to SABIT, dated May 23, 2011. In this letter, which appears to have been signed by SABIT, SABIT wrote "I suspect that [Patient-5] will require interventional procedures down the road given the severity of [his/her] symptom this early on."

   b. An "ED Physician Notes" report from Hospital-1 dated October 26, 2011. Within this report, in a section labeled "Calls-Consults"

the documenting physician stated "[SABIT]  called to discuss case.
[H]e states patient has had a very extensive work up and her
lumbar and cervical spine findings on imaging show nothing that
needs to be operated on… [SABIT] states we can order whatever
test we fell is necessary but he does not want to be involved as he
does not think there is anything acute occurring."

c. A "FOLLOWUP VISIT" report, on MBSPG letterhead, dated
November 4, 2011, in which, under the "ASSESSMENT/PLAN"
section, it states "At this point, I think I will schedule [Patient-5]
for an anterior cervical discectomy and fusion at C4-C5 level.

d. An Operative Report dated November 16, 2011, documenting the
cervical surgery SABIT purportedly performed on Patient-5.
Included within the "Procedure Performed" section of the report,
SABIT indicated he, among other procedures, performed a
discectomy and fusion at the C4-C5 levels.

e. An Operative Report dated February 14, 2012, documenting the
lumbar surgery SABIT purportedly performed on Patient-5.
Included within the "Procedure Performed" section of the report,
SABIT indicated he, among other procedures, performed a
Laminectomy at the L4, L5 and S1 levels.

f. "FOLLOWUP VISIT" reports, on MBSPG letterhead, dated
February 20, 2012, February 27, 2012, and March 9, 2012. On the
March 9, 2012 report, SABIT documented "[Patient-5] will follow
up with me in four to six weeks' time."

g. An "ED Physician Notes" report from Hospital-1 dated March 23,
2012. Within this report the documenting physician stated "Spoke
with patient's surgeon, Dr Sabit who states [Patient-5's] spinal

surgery was minor and her numbness is likely related to [a debilitating desease] (patient denies [the disease]) he doesn't want patient transferred or to be consulted on this patient."

h. A "Progress Notes" report from Hospital-1 dated April 5, 2012, in which the documenting physician stated "Clinically doubt patient has multiple sclerosis…"

i. An "ATTENDING PHYSICIAN's CERTIFICATE" on MBSPG letterhead, dated February 17, 2012, documenting employment disability for Patient-5. Within this form, which appears to be signed by SABIT, is a handwritten address of 29355 Northwestern Hwy. Suite 130, Southfield, Michigan.

88. Your affiant is also aware of several other former patients of SABIT that have reportedly undergone spinal surgeries performed by SABIT, only to learn later, through other doctors, that SABIT did not perform the intended surgery and/or did not use the indicated hardware. Your affiant has not yet had an opportunity to interview all such patients.

*Employee Interview*

89. Your affiant has interviewed a former employee (Employee-1) of SABIT. Employee-1 stated that SABIT performed surgery on everyone that walked through his office. Employee-1 then revised that statement by stating that "at least 90 percent" of SABIT's patient's, "maybe more," received surgery. Employee-1 clarified that not all of SABIT's patients received surgery because some patients just never returned to his office

after being told they needed surgery.

90. Employee-1 recalled instances when a Physician's Assistant (PA), who worked for SABIT, would read the results of MRI reports to SABIT and summarize that, in the PA's opinion, the patient did not need surgery. Regardless of the PA's opinion, SABIT would schedule an injection and a surgery at the same time. The results of the injection did not matter, because the surgery was already scheduled. Employee-1 stated that SABIT wanted surgery on every patient. Employee-1 felt that any pre-surgical steps performed at SABIT's office were just check boxes to get to the surgery.

91. Employee-1 stated that some of SABIT's patients requested certain pain medications which were very strong. According to Employee-1, SABIT told patients that he would prescribe them with their requested medications if the patient scheduled a surgery. Employee-1 reportedly told SABIT that he "can't bribe patients for surgery" but SABIT was "always right."

92. Employee-1 thought that SABIT was targeting patients covered under auto insurance.

*Review of Billing Data*

93. Your affiant has reviewed the billing data for services purportedly billed by SABIT to numerous insurance carriers. A few of these insurance carriers, to which SABIT has billed for his purported services, are listed below, along with the respective billed and paid amounts for these insurance carriers. It should be noted that the following list is not all encompassing of SABIT's billings, as SABIT is known to have billed

numerous insurance companies, in particular, auto insurance companies, and not all such data was available for review at the time of this writing.

| Insurance Carrier | Timeframe Reviewed | Amount Billed | Amount Paid |
|---|---|---|---|
| Medicare | 01/2011 - 06/2014 | $16,022,668.35 | $860,992.09 |
| BCBSM | 01/2012 - 04/2014 | 10,943,411.28 | 628,802.40 |
| Medicaid | 04/2011 - 06/2014 | 5,811,602.26 | 341,210.74 |
| Totals | | $32,777,681.89 | $1,831,005.23 |

94. Your affiant has further analyzed the billed and paid amounts as detailed above, to show that the majority of the amounts billed by, and paid to, SABIT relate to spinal surgeries.  The top 10 billing codes, for Medicare, Medicaid, and BCBSM, respectively, are broken down as follows:

a.  Medicare:

| CPT Code | CPT Code Description | Amount Billed | Amount Paid |
|---|---|---|---|
| 22612 | Fusion of lower spine bones, posterior or posterolateral approach | 1,886,105.00 | 132,736.42 |
| 63047 | Partial removal of middle spine bone with release of spinal cord and/or nerves | 1,281,041.00 | 49,681.22 |
| 22551 | Fusion of spine bones with removal of disc at upper spinal column, anterior approach | 959,461.00 | 61,809.96 |
| 22614 | Fusion of spine bones, posterior or posterolateral approach | 675,759.00 | 42,690.25 |
| 22840 | Insertion of posterior spinal instrumentation at base of neck for stabilization, 1 interspace | 524,750.00 | 35,838.19 |
| 22851 | Insertion of spinal instrumentation for spinal stabilization | 505,590.00 | 35,833.23 |
| 22845 | Insertion of anterior spinal instrumentation for spinal stabilization, 2 to 3 vertebral segments | 503,884.00 | 36,681.55 |
| 22842 | Insertion of posterior spinal instrumentation for spinal stabilization, 3 to 6 vertebral segments | 474,464.00 | 24,483.20 |
| 63048 | Partial removal of spine bone with release of spinal cord and/or nerves | 437,967.00 | 26,243.86 |

| CPT Code | CPT Code Description | Amount Billed | Amount Paid |
|---|---|---|---|
| 63030 | Partial removal of bone with release of spinal cord or spinal nerves of 1 interspace in lower spine | 405,911.00 | 20,474.56 |
| | Totals | 7,654,932.00 | 466,472.44 |

b. BCBSM:

| CPT Code | CPT Code Description | Amount Billed | Amount Paid |
|---|---|---|---|
| 22612 | LUMBAR SPINE FUSION | 1,260,703.00 | 78,953.49 |
| 22551 | FUSION OF SPINE BONES WITH REMOVAL OF DISK AT UPPER SPINAL COLUMN, ANTERIOR APPROACH | 726,858.00 | 65,132.24 |
| 63047 | REMOVAL OF SPINAL LAMINA | 657,852.00 | 30,642.78 |
| 63030 | LOW BACK DISK SURGERY | 452,166.00 | 31,937.29 |
| 22840 | INSERT SPINE FIXATION DEVICE | 382,130.00 | 31,178.56 |
| 22845 | INSERT SPINE FIXATION DEVICE | 367,574.00 | 40,030.62 |
| 22851 | APPLY SPINE PROSTH DEVICE | 338,682.00 | 33,716.12 |
| 22614 | SPINE FUSION, EXTRA SEGMENT | 335,664.00 | 12,373.15 |
| 22842 | INSERT SPINE FIXATION DEVICE | 273,913.00 | 9,772.10 |
| 20930 | SP BONE ALGRFT MORSEL ADD-ON | 247,010.00 | 4,818.05 |
| | Totals | 5,042,552.00 | 338,554.40 |

c. Medicaid:

| CPT Code | CPT Code Description | Amount Billed | Amount Paid |
|---|---|---|---|
| 22612 | Lumbar spine fusion | 776,842.28 | 40,162.17 |
| 22551 | NECK SPINE FUSE&REMOV BEL C2 | 517,068.02 | 34,920.51 |
| 22840 | Insert spine fixation device | 375,733.57 | 22,511.64 |
| 63047 | Removal of spinal lamina | 336,246.35 | 12,470.36 |
| 63030 | LOW BACK DISK SURGERY | 318,485.36 | 12,830.59 |
| 22845 | Insert spine fixation device | 261,169.80 | 20,353.32 |
| 22851 | APPLY SPINE PROSTH DEVICE | 256,171.06 | 21,371.87 |
| 22614 | SPINE FUSION EXTRA SEGMENT | 205,279.87 | 11,040.32 |
| 22633 | LUMBAR SPINE FUSION COMBINED | 187,835.31 | 9,805.32 |
| 63048 | Remove spinal lamina add-on | 150,031.66 | 12,522.87 |
| | Totals | 3,384,863.28 | 197,988.97 |

95. Your affiant asserts that the numbers above show that the majority of amounts billed by, and paid to, SABIT relate to spinal surgeries, as the

top 10 billing codes for each of these insurers relate to spinal surgeries. However, it should be noted that SABIT's billings related to spinal surgeries are not limited to the top 10 billing codes for each insurer.

### *Deposition and interview of SABIT*

96. Your affiant is aware that on January 30, 2014, SABIT was deposed in a civil case during which he was questioned by a Trial Attorney of the United States Department of Justice. Your affiant has received a copy of this deposition.

97. During this January 30, 2014 deposition, SABIT stated that he had recently applied to numerous positions overseas, including a fellowship position in London, England, and a couple hospitals in Dubai, United Arab Emirates (UAE). SABIT further stated that he had recently travelled to Dubai and Afghanistan.

98. During this aforementioned deposition, when questioned regarding whether or not SABIT had billed for services he did not perform, SABIT replied "I would only dictate what I did."

99. On September 12, 2014, SABIT crossed an international border by attempting to board a flight from Atlanta Hartsfield International Airport destined for Dubai, United Arab Emirates. SABIT was interviewed by a CBP Officer, prior to boarding the flight. SABIT told the Officer that he was a Neurosurgeon practicing in the state of Michigan, and was bound for Dubai in order to attend a conference, which was sponsored by the U.S. Department of State, regarding conducting business in Afghanistan. SABIT informed the interviewing Officers that he was the owner and Chief Executive Officer (CEO) of a business by the name of

AMERICAN MINERAL & OIL, LLC, which is located in Birmingham, Michigan. SABIT stated that he is in the business of mining in Afghanistan.

100. During the above mentioned interview, the interviewing Officers inspected SABIT's baggage, and during this inspection Officers discovered a plastic bag which contained two (2) semi-precious stones, an emerald which was cut and polished, with a weight on the bag stating 3.60 carats, and one rough ruby which had not been cut or polished. Also in the bag was a receipt for re-cutting the gem stone (emerald).

## UNLAWFUL PROCUREMENT OF CITIZENSHIP

101. During July 2014, HSI Detroit initiated an investigation of SABIT based upon allegations that he failed to disclose previous and ongoing criminal activity, for which he had not been arrested, during his naturalization application process. SABIT, prior to and following his naturalization as a United States citizen on May 10, 2013, was knowingly committing crimes for which he hadn't been arrested, namely the above mentioned health care fraud. SABIT's ongoing criminal activity is considered an aggravated felony under section 101(a)(43)(M)(i) of the Immigration and Naturalization Act (INA). These crimes and his failure to disclose them made him statutorily ineligible for naturalization.

### *Naturalization Application Process*

102. The naturalization application process consists of four major steps, which the applicant must successfully and honestly complete. First, the

applicant must submit an N-400 Application for Naturalization. Second, the applicant must present themselves for a "naturalization interview", which is a sworn in-person interview with a U.S. Citizenship and Immigration Services (CIS) Officer (ISO). Third, the applicant must complete and submit a pre-oath ceremony questionnaire found on the N-445 Notice of Naturalization Oath Ceremony. Finally, and only if successful in completing the N-400 application, the in-person interview, and the N-445 questionnaire, the applicant must attend the formal oath of citizenship ceremony, where the applicant formally naturalizes and becomes a United States citizen.

103. During the interview portion of the naturalization process, an ISO places the applicant under oath and then reviews the N-400 application and selected questions. The ISO notes any changes or clarifications on the applicant's N-400 application, including any changes that occurred from the date the N-400 application was originally submitted to the date of the in-person interview. The applicant is required to acknowledge any change(s) or clarifications during the in-person interview and again signs the application.

104. Following the in-person interview, the ISO either recommends the application for approval or requests additional information from the applicant based on a disclosure of criminal activity, formally known as a "Request for Evidence", and the application process is continued. If the application is approved, CIS sends the applicant a N-445 notice and questionnaire, which tells the applicant the date and time of their ceremony.

105. The N-445 questionnaire covers a range of topics, including an applicant's recent criminal history; accounting for the period following

the naturalization in person interview until the day of the oath ceremony. CIS reviews the questionnaire on the day of the ceremony. If the answers provided in the N-445 questionnaire are approved, the applicant is allowed to take the oath and naturalize. If the answers are not approved, the applicant is not allowed to proceed with the oath ceremony and is referred for re-interview.

106. A primary purpose of the N-400 application, the naturalization interview, and the N-445 questionnaire is to establish that the applicant possesses Good Moral Character (GMC), a statutory requirement for naturalization.

107. Per Title 8 Code of Federal Regulations (CFR) Parts 316.10(b)(1)(ii) and (2)(vi), any applicant who commits an aggravated felony after November 29, 1990 or gives false testimony to obtain any benefit under the Immigration and Nationality Act during the statutory period[2] will be found to lack GMC.

### Facts and Circumstances

108. The review of SABIT's Alien Registration File (A-File), the official DHS record of an alien's immigration history, police and judicial records, and interviews revealed the following:

109. On November 5, 2012, SABIT completed and signed under penalty of perjury his N-400 application. Above his signature the following certification appeared:

---

[2] In general, the statutory period for GMC for an applicant filing under the general naturalization provision starts five years prior to the date of filing. An applicant is expected to maintain their GMC during the application process until their naturalization. See 8 CFR 316.2(a)(7) and 8 CFR 316.10(a)(1).

"I certify, under penalty of perjury under the laws of the United States of America, that this application, and the evidence submitted with it, are all true and correct.  I authorize the release of any information which USCIS needs to determine my eligibility for naturalization."

110. Part 10, section D, Good Moral Character, Questions 15 of the N-400 application asks:

"Have you **ever** committed a crime or offense for which you were **not** arrested?" [Emphasis in original]

111. In response, SABIT indicated "No".  Your affiant asserts that this response was intentionally false.

112. As outlined above, SABIT was engaging in numerous federal criminal violations related to defrauding a federally-funded health care program, as well as various private insurance companies, in violation of 18 U.S.C. § 1347.

113. On April 24, 2013, ISO Valerie Garmon conducted the interview portion of SABIT's naturalization application at the CIS office in Detroit, Michigan.  After reviewing his identification, ISO Garmon placed SABIT under oath and began the interview.

114. ISO Garmon specifically reviewed and asked Part 10, section D, Good Moral Character, Question 15:

"Have you **ever** committed a crime or offense for which you were **not** arrested?" [Emphasis in original]

115. In response, SABIT affirmed his original response of November 5, 2012, as signed and submitted on his N-400 application, that he had not ever committed a crime for which he was not arrested.

116. CIS approved SABIT's application and provided SABIT with a N-445 Notice of Naturalization Oath Ceremony; scheduling it for May 10, 2013.

The N-445 notice also contains a list of questions that are to be answered on the day of the ceremony. They concern, among other things, the applicant's criminal activity between the date of the naturalization interview and the oath ceremony.

117. On May 10, 2013, SABIT completed the N-445 questionnaire, answering "No" to Question 3, which asks:

"Since your interview, have you knowingly committed any crime or offense, for which you have not been arrested?"

118. SABIT then naturalized as a U.S. Citizen in Detroit without disclosing the aforementioned information regarding his ongoing health care fraud activities.

## CONCLUSION

119. Based on the foregoing, your affiant asserts that probable cause exists that SABIT has committed Health Care Fraud, in violation of Title 18 United States Code § 1347, by performing medically unnecessary services, and billing for services not rendered. Additionally, your affiant asserts that probable cause exists that SABIT unlawfully obtained his citizenship in violation of Title 18 United States Code § 1425(a).

## REQUEST FOR SEALING

120. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that

sealing this document is necessary because the items and information to be seized are relevant to numerous ongoing investigations into criminal organizations as not all of the targets of this investigation, or related investigations, will be searched at this time.  Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, e.g., post them publicly online through the carding forums.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigations and may severely jeopardize their effectiveness.

121. Furthermore your affiant believes that SABIT has the means and motive to flee prosecution if he is advised of this warrant, as he has traveled internationally numerous times in the past few months.  As detailed above, SABIT is the Chief Executive Officer (CEO) of a business which is set up to conduct business in Afghanistan. Additionally, SABIT has traveled internationally at least six times in the past approximately 18 months, including multiple visits to his mother, who is a citizen of Canada, and his father and other relatives, who are citizens of, and former or current high-level government officials in, Afghanistan.

Respectfully submitted,

Peter A. Hayes
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on November 21, 2014:

UNITED STATES MAGISTRATE JUDGE